**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES CUSTOMS AND BORDER PROTECTION, *et al.*,**<br><br>Defendants. | Case No. 1:18-cv-00155 (TNM) |

## <u>MEMORANDUM OPINION</u>

This case arises at the thorny intersection of government and social media.  In 2017, U.S. Customs and Border Protection ("CBP") directed Twitter to divulge details about a user who criticized CBP's policies.  The agency relied on 19 U.S.C. § 1509, a provision that allows CBP to summon anyone who has improperly exported or imported merchandise in the United States.  Unsurprisingly, Twitter objected.  Amid the public outcry that followed, CBP backed down.

Alarmed at CBP's actions, Reporters Committee for Freedom of the Press ("the Committee") submitted multiple requests under the Freedom of Information Act ("FOIA") for records related to CBP's interactions with Twitter.  The agency's search for responsive records yielded thousands of pages.  But the agency withheld or redacted many of those pages.

Now, over four years after the actions that spawned those requests, the Committee challenges CBP's response.  The matter is before the Court on cross-motions for summary judgment.  Both motions will be granted in part and denied in part.

**I.**

In March 2017, CBP's Office of Professional Responsibility (OPR) issued a summons to Twitter under authority allegedly provided by 19 U.S.C. § 1509.  *See* Fourth Declaration of Patrick Howard ¶¶ 11–13 ("Howard 4th Decl."), ECF No. 59-3; Defendants' Statement of Material Facts ¶ 3, ECF No. 59-2.  CBP requested "all records," including the "user name[], account login, phone numbers, mailing addresses, and IP addresses" for the user behind the Twitter account @ALT_uscis, which had been critical of CBP policies.  Compl. Ex. C at 10, ECF No. 1-3 (copy of CBP summons to Twitter).[1]  Special Agent in Charge Stephen Caruso signed the summons, which ordered Twitter to "appear" before Special Agent Adam Hoffman. *Id.*

Twitter sued one month later, arguing that the summons exceeded CBP's authority and violated Twitter's First Amendment right.  *See* Howard 4th Decl. ¶ 14.  CBP withdrew the summons the next day, mooting the case, if not the controversy.  *See id.* ¶ 15.

Soon after, the Committee filed a FOIA request for agency records related to the @ALT_uscis Twitter account and the Twitter summons generally.  *See* Compl. Ex. D at 3, ECF No. 1-4.  The agency began to search for documents responsive to the Committee's request. While that search progressed, the Department of Homeland Security's ("DHS") Inspector General released a report detailing his investigation into the imbroglio.  *See* Compl. Ex. B, ECF No. 1-2.  He concluded that CBP "may have exceeded the scope of its authority under Section 1509," which "addresses ascertainment, collection, and recovery of *customs duties*."  *Id.* at 4–5 (emphasis in original).

---

[1]  All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

By January 2018, CBP had produced no records in response to the Committee's FOIA request.  Dissatisfied with that lack of response, the Committee sued the agency (along with DHS), seeking to compel production of responsive records.  *See* Compl., ECF No. 1.  Two months later, the Committee filed a second FOIA request for all "processing notes" and "email communications" about how CBP had addressed the Committee's first request.  *See* Howard 4th Decl. ¶ 26.  The Committee then filed a third FOIA request for any agency records that referenced 19 U.S.C. § 1509.  *See id.* ¶ 29.  When CBP failed to respond to the two most recent FOIA requests, the Committee filed another lawsuit.  *See* Compl., Civil Action No. 18-cv-1289. The Court consolidated the two lawsuits.  *See* Minute Entry, June 12, 2018.

From April 2018 to December 2019, the agency released 4,151 pages of records to the Committee in 19 responses.  *See* Howard 4th Decl. ¶ 35.  CBP listed all produced documents in a *Vaughn* Index.  *See* Howard 4th Decl., Ex. A, ECF No. 43-2.  According to that Index, some released pages contained information that was exempt from FOIA's prohibitions.  For those documents, the agency released only the non-exempt information.

Each party then moved for summary judgment.  The Government argued that it had properly responded to the Committee's requests.  *See* Motion for Summary Judgment, ECF No. 43.  The Committee argued the opposite.  *See* Cross-Motion for Summary Judgment, ECF No. 45.  The Court denied both motions, holding that the agency's *Vaughn* Index and accompanying declarations were so "plainly inadequate" that the Court could not "meaningfully review" the record.  Order at 2–3, ECF No. 52.  The Court ordered the agency to submit a new Index before further summary-judgment briefing could occur.  *See id.* at 3.  After the Court's order, CBP consulted with the Committee and released 127 pages with revised redactions.  *See* Pl.'s Statement of Material Facts ¶ 50, ECF No. 60-2.

The parties then cross-moved for summary judgment.  *See* Defendants' Motion for Summary Judgment, ECF No. 59 ("Defs.' MSJ"); Plaintiff's Cross-Motion for Summary Judgment, ECF No. 60 ("Pl.'s MSJ").  Those motions are now before the Court.[2]

## II.

To prevail on a motion for summary judgment, a party must show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  FOIA requires "disclosure of documents held by a federal agency unless the documents fall within one of nine enumerated exemptions, which are listed at 5 U.S.C. § 552(b)."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  To obtain summary judgment, the agency bears the burden to show the applicability of the claimed exemptions.  *See ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011).  Courts construe these exemptions narrowly.  *See Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011).  Courts review the applicability of FOIA exemptions de novo.  *See King v. DOJ,* 830 F.2d 210, 217 (D.C. Cir. 1987).

To meet its burden, an agency may rely on declarations describing the applicability of a FOIA exemption to information that the agency has withheld.  *See Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018).  Those declarations receive "a presumption of good faith."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  The Court may grant summary judgment based solely on the agency's declarations if they are not contradicted by contrary record evidence or by evidence of the agency's bad faith.  *See Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017)*.*

Here, CBP cited three of FOIA's nine exemptions to justify withholdings.  *See generally* Howard 4th Decl., Ex. A, ECF No. 59-4 ("*Vaughn* Index").  Exemption 5 allows nondisclosure

---

[2]  The Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

of records "that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Put simply, a FOIA requester cannot obtain by FOIA what the requester could not obtain in a lawsuit against the agency. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Thus, documents protected under (as relevant here) the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege in civil litigation may be withheld under FOIA. *See Sierra Club*, 141 S. Ct. at 785.

CBP also withheld information under Exemptions 6 and 7(C), which cover information that, if disclosed, might threaten personal privacy. *See* 5 U.S.C. § 552(b)(6), (b)(7)(C). Lastly, CBP withheld information under Exemption 7(E), which protects information that, if disclosed, would divulge techniques, procedures, or guidelines for law enforcement investigations or prosecutions. *See id.* § 552(b)(7)(E).

Whether an exemption applies, however, does not end the matter. Under a 2016 amendment to FOIA, an agency may not withhold exempt materials unless the agency "reasonably foresees that disclosure would harm an interest protected by" a FOIA exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). Early decisions in this district construing this language held that, to meet the foreseeable-harm standard, the agency must articulate a link between the withheld information and the foreseen harm. *See, e.g.*, *Jud. Watch, Inc. v. Dep't of Com.*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019). How specific an agency's explanation needed to be, however, remained a somewhat open question, particularly in decisions that involved the deliberative process privilege under Exemption 5.

Two recent cases from the D.C. Circuit elucidate how courts should deal with the foreseeable harm requirement. In *Machado Amadis v. Department of State*, 971 F.3d 364, 370 (D.C. Cir. 2020), the agency withheld under the deliberative process privilege some

recommendations, discussion, and search notes about FOIA processing.  The court upheld the applicability of the privilege to the information.  *See id.*  The court also held that the agency had met the foreseeable harm requirement.  The agency's declaration said that disclosure of the forms would discourage candid discussions among line attorneys, thereby hindering "the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals."  *Id.* at 371 (quoting agency declaration).  The court rejected the plaintiff's counterargument that the agency had provided only "generalized assertions that 'could' chill deliberations."  *Id.* (quoting plaintiff's brief).  According to the court, the agency instead had "specifically focused on the information at issue" in the forms and had "concluded that disclosure of that information 'would' chill future discussions."  *Id.* (quoting agency declaration).  Thus, the agency permissibly withheld the privileged information.

The D.C. Circuit returned to the foreseeable harm requirement in *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021).  There, the Committee submitted multiple FOIA requests for records about FBI agents impersonating reporters.  The FBI withheld a bevy of information under the deliberative process privilege, including emails between Director Comey and agency officials on a public editorial written by Comey about the incident.  *See id.* at 360-61.  The Committee challenged those withholdings.

The court first concluded that the privilege did not apply to some withheld information.  For the information that was privileged, the court then turned to the foreseeable harm requirement.  The FBI's main declaration (the Hardy Declaration) said that disclosing the material "would have an inhibiting effect upon agency decisionmaking" because disclosure "would chill full and frank discussions" inside the agency.  *Id.* at 370.  The FBI worried that decisionmakers would be "less candid and more circumspect in expressing their thoughts."  *Id.*

The court rejected this explanation as insufficient because the FBI had merely "mouth[ed] the generic rationale for the deliberative process privilege itself." *Id.* The FBI had not given a "focused and concrete" explanation for why disclosure of the particular information would, "in the specific context of the agency action at issue, actually impede those same agency deliberations moving forward." *Id.* Instead, the agency had submitted a "perfunctory statement" that disclosure "would jeopardize the free exchange of information" between decisionmakers. *Id.* The agency's failure to show a foreseeable harm required disclosure of a draft Inspector General report, even though the deliberative process privilege covered that report. *See id.* at 371.

The court reached a different conclusion about the emails involving Director Comey and emails between FBI attorneys and personnel about the agency's undercover investigations policy. Although the Hardy Declaration's insufficient explanation applied to these records, the court noted that both sets of emails discussed "sensitive undercover operations in the midst of a policy crisis." *Id.* As the court said, "the sensitivity of the context in which these conversations arose as well as their subject matter . . . provide the particularized context for a finding of foreseeable harm." *Id*

After *Amadis* and *Reporters Committee*, agencies must make two showings. *First*, the agency must, as always, show that a FOIA exemption applies to withheld information. *See Jud. Watch, Inc. v. Dep't of Treasury*, 802 F. Supp. 2d 185, 193 (D.D.C. 2011). *Second*, the agency must articulate, in a "focused and concrete" way, the harm that would result from disclosure, including the basis and likelihood of that harm. *Reporters Comm.*, 3 F.4th at 369. But even without a sufficient explanation from the agency, the "context and purpose" of withheld information can support a finding of foreseeable harm. *Id.* at 372. An agency's failure to make both showings warrants disclosure. *See Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d

90, 106 (D.D.C. 2019) ("In sum, FOIA now requires that an agency release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law.") (cleaned up).

### III.

### A.

CBP withheld seven categories of documents under Exemption 5.  *See* Howard 4th Decl. ¶¶ 43–52.  As described above, Exemption 5 protects from disclosure any "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  CBP withheld information under the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege.

The deliberative process privilege shields from disclosure the advisory opinions, recommendations, and deliberations that comprise some part of a process through which the agency formulates decisions and policies.  *See NLRB*, 421 U.S. at 150.  Documents that embody a final decision, however, are not protected by this privilege "because once a decision has been made, the deliberations are done."  *Sierra Club*, 141 S. Ct. at 785.

Thus, documents must be predecisional and deliberative before they can be exempt from disclosure.  *See id.* at 786.  A document is predecisional when generated before the agency's final decision on the matter to which the document relates.  *See id.*; *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (predecisional documents are "generated before the adoptions of an agency policy").  A document is deliberative if the document was prepared as "part of the agency give-and-take—of the deliberative process—by which" the agency made the decision. *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975).

The attorney-client privilege encourages clients "to be as open and honest as possible with attorneys." *Coastal States*, 617 F.2d at 862.  The privilege "is not limited to communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter." *Id.*  In the governmental context, "the client may be the agency and the attorney may be an agency lawyer." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).  Confidentiality is a "fundamental prerequisite" of this privilege, and therefore confidentiality must exist both "at the time of the communication and [be] maintained" after the communication has been made. *Coastal States*, 617 F.2d at 863.

The attorney work-product privilege "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Id.* at 864.  Thus, FOIA exempts from disclosure materials prepared by an attorney in anticipation of litigation.  *See Nat'l Ass'n of Crim. Def. Lawyers v. DOJ Exec. Off. for U.S. Attys.*, 844 F.3d 246, 250–51 (D.C. Cir. 2016).

With those standards in mind, the Court addresses in turn each of the seven withheld categories.

## 1.

Based on CBP's declarations, Category 1 covers emails "about the issuance of the 19 U.S.C. § 1509 summons," including "discussions about how to respond to Twitter's refusal to comply with the summons."  Howard 4th Decl. ¶ 46.  Although the Government offers little on this point, CBP employees presumably sent emails "about the issuance" of the summons both before and after the agency sent the summons to Twitter.  In fact, the Government's Index lists as withheld several emails from before the issuance of the summons.  *See, e.g.*, *Vaughn* Index at 36–37 (entries from February 2017, one month before the summons, for emails "regarding the

Twitter summons and the Twitter lawsuit").  Discussions on how the agency should respond to Twitter's refusal to comply obviously occurred after issuance of the summons.

The Court agrees with the Government that the documents in Category 1 fall within the deliberative process privilege.  Emails sent before the decision to issue a summons were, by definition, predecisional.  *See, e.g.*, *Senate of the Cmnwlth of Puerto Rico v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987).  And the Committee does not contest the Government's declaration that those emails "reflect[] internal agency deliberation about" the decision to issue a summons and thus formed a part of the agency's deliberative process.  Defs.' MSJ at 17.  The pre-issuance emails therefore are exempt from disclosure under the deliberative process privilege.

The privilege likewise covers the post-issuance emails.  CBP employees sent those before the agency decided to withdraw the summons—making them predecisional to the withdrawal. And the Committee again does not contest the Government's statement that those emails "reflect the agency's internal deliberative process" about whether to withdraw the summons.  *Id.*

Separate from CBP's explanation, however, the Committee challenges the nondisclosure of some specific documents that the Court believes should be part of this category.[3]

The Committee challenges the nondisclosure in full of six pages from a PowerPoint presentation titled "Use of the Customs Summons in Trade Enforcement Cases 19 U.S.C. § 1509," which was emailed as part of an invitation to a training series for CBP employees.  *See* Second Declaration of Katie Townsend ("Townsend 2nd Decl."), Ex. C at 84, 104, 106–09, ECF No. 60-6.  The Government has not justified withholding this.  The *Vaughn* Index says that the

---

[3]  Perhaps because of the large size of the *Vaughn* Index, the Government does not specify which documents withheld under Exemption 5 fall into which of the seven categories.  But the specific records mentioned here aptly fit the category's description:  all are "emailed communications between CBP employees" about the issuance of the summons and the "proper use" of the § 1509 authority.  Howard 4th Decl. ¶ 46.

agency applied Exemption 5 to "discussions within the presentation on matters of policy regarding the enforcement of summonses." *Vaughn* Index at 91 (entry for FOIA003573–003607).

That explanation fails to show how the presentation could be predecisional. No record evidence supports that the presentation factored into the decision to issue or withdraw the Twitter summons. In fact, the presentation only appears in the record as an attachment to a May 2, 2017 email, one month after CBP withdrew the summons. *See* Townsend 2nd Decl., Ex. C at 79. CBP identifies no other later decision to which the presentation relates. *See Abtew v. DHS*, 808 F.3d 895, 899 (D.C. Cir. 2015) ("A document is predecisional if it precedes, in temporal sequence, the decision to which it relates.") CBP therefore has not shown that the redacted material in the presentation meets the requirements for the deliberative process privilege. Thus, CBP must disclose those six pages in full.

The same analysis largely applies for the next document sought by the Committee. The agency withheld a portion of an email that contained "an investigative report regarding the emails released on Twitter." *Vaughn* Index at 25 (entry for FOIA00376–00379). The Committee correctly argues that this withheld report was not predecisional. The agency fails to show, much less contend, that the report related to a decision that came later. The decision to withdraw the summons does not apply—the email including the report was sent two days *after* the agency had withdrawn its summons to Twitter. *See* Townsend 2nd Decl., Ex. B at 15, ECF No. 60-5. The Court might think differently if the agency could show that the report had been written before that withdrawal and had played some part in the agency's decision to withdraw the summons. But CBP provides no basis to support that proposition, relying instead on a perfunctory comment that the report "relates to the deliberative process." *Vaughn* Index at 25;

*see Citizens for Resp. and Ethics in Wash. v. Dep't of Int'r*, 746 F.3d 1082, 1100 (D.C. Cir. 2014) (rejecting an agency's "conclusory explanation" as "insufficient").

The agency suggests in its reply that the withheld material contains "drafts and preliminary versions of responses not yet approved for release." Defendants' Reply at 11 ("Defs' Reply"), ECF No. 63.  But the *Vaughn* Index identifies no drafts in that email, a marked difference from other similar Index entries.  *See, e.g.*, *Vaughn* Index at 26 (entry for FOIA00434–00439 mentioning a "draft report").  More, the Court cannot rely on such a conclusory statement to justify the applicability of an exemption.  *See Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) ("[C]onclusory and generalized allegations of exemptions are unacceptable.").  The agency must do more.  CBP must release FOIA00376–00379 without redactions for material withheld under the deliberative process privilege.

CBP suffers from the same issue for FOIA00626–00645, an email-attached "memorandum prepared for leadership as a summary of circumstances that led for issuance of [the] Twitter Summons." *Vaughn* Index at 31.  Within that email and its attachments, CBP applied Exemption 5 only to FOIA00628–FOIA00629.  *See* Townsend 2nd Decl., Ex. L at 36–37, ECF No. 60-15.  Like the previous two documents, the email was sent after CBP withdrew the summons, *see id.* at 34, and the agency identifies no other decision to which the memorandum contributed.  CBP again asserts that the email contains draft communications between agency employees, *see* Defs' Reply at 11, but again does not support that contention. The *Vaughn* Index does not say that this document includes a draft; in fact, a different entry appears to include the draft memorandum.  *See Vaughn* Index at 41 (entry for FOIA00940–00943 including a "draft summary related to Twitter lawsuit); Townsend 2nd Decl., Ex. A at 5–8, ECF No. 60-4.  And the attachment's file name includes the word "FINAL," implying that the

attachment is not a draft at all.  *See* Townsend 2nd Decl., Ex. L at 34.  The agency has again failed to demonstrate why the deliberative process privilege applies to this material.  CBP will release FOIA00628–00629 without redactions for material previously withheld under the deliberative process privilege.

The Committee challenges no other specific withholdings in this category.  Rather, it argues that the entire category should be disclosed under the so-called government-misconduct exception to the deliberative process privilege.  The D.C. Circuit first acknowledged this concept in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997).  The court there held that the deliberative process privilege "disappears altogether when there is any reason to believe government misconduct occurred."  *Id.* at 746.  The Committee contends that the agency's use of its authority to "unmask the individuals" behind a critical Twitter account qualifies as government misconduct sufficient to overcome the privilege.  Pl.'s MSJ at 17.  The Government responds that the exception does not apply to a FOIA case.  *See* Defs' Reply at 7–9.

The Government correctly points out that courts in this circuit have not definitively answered whether the government-misconduct exception applies in the FOIA context.  *In re Sealed Case* discussed the deliberative process privilege in the context of the common law, not a request under FOIA.  *See In re Sealed Case*, 121 F.3d at 738 n.5 (noting that the ability to overcome the privilege via a sufficient showing of need "is not an issue in FOIA cases").  District courts since then have disagreed about whether, in FOIA cases, the misconduct exception can overcome the deliberative process privilege.  *Compare Nat'l Whistleblower Ctr. v. HHS*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012) ("[T]he Court here finds that the government-misconduct exception may be invoked to overcome the deliberative-process privilege in a FOIA suit.") *with Wright v. Admin. for Child. & Fams.*, No. 15-cv-218, 2016 WL 5922293, at *11

(D.D.C. Oct. 11, 2016) ("Accordingly, the Court concludes that the government misconduct exception . . . cannot overcome an otherwise valid withholding pursuant to Exemption 5.").  The D.C. Circuit recently acknowledged that no binding precedent recognizes a government-misconduct exception in FOIA cases.  *See Protect Dem. Project, Inc. v. NSA*, 10 F.4th 879, 888 (D.C. Cir. 2021).  But the Circuit declined to decide whether the misconduct exception from *In re Sealed Case* applies to the FOIA context.  *See id.*, n.3.

This Court likewise need not render an opinion on the government misconduct exception because the Committee successfully challenges the agency's foreseeable harm analysis.  CBP's discussion of foreseeable harm in Category 1 amounts to one sentence:

> Disclosure of such deliberative email communications would hamper CBP's day-to-day operations because employees would not feel comfortable to divulge their views on ongoing cases or issues knowing their pre-decisional thoughts may become public.

Howard 4th Decl. ¶ 46.  This explanation bears a remarkable similarity to the insufficient Hardy Declaration in *Reporters Committee*.  There, the FBI justified nondisclosure because employees would be "more circumspect" in expressing their thoughts.  *Reporters Comm.*, 3 F.4th at 370.  CBP makes a more sweeping generalization, saying that employees "would not feel comfortable" if they knew their views would be disclosed.  If the Hardy Declaration failed to pass muster, the perfunctory statement from CBP here fails too.  CBP also asserts that disclosure would "hamper [the agency's] day-to-day operations," Howard 4th Decl. ¶ 46, but fails to explain how, beyond the "generic and nebulous" discomfort of employees, disclosure of this particular information would do so, *Ctr. for Invest. Rep.*, 436 F. Supp. 3d at 106.  Both parts of CBP's one-sentence explanation thus fail to explain in a "focused and concrete way" how disclosure of the Category 1 documents will impede future agency deliberations.  *Reporters Comm.* at 370.

The Court also finds that the "context and purpose" of these documents does not suggest foreseeable harm from disclosure. *Id.* at 371. As recognized by the agency's own Inspector General, CBP pressured a private company under dubious authority. Those actions arose a long way from the sensitive context of the Comey emails in *Reporters Committee. See id.* The agency must disclose all material withheld in Category 1.

## 2.

Category 2 of the withheld records contains "email communications between individuals in various CBP offices . . . on how to handle and respond to the lawsuit filed by Twitter." Howard Fourth Decl. ¶ 47. The agency declares that these emails reflect the "internal deliberative process the agency engaged in before" it decided to withdraw its summons. *Id.*

As with the records in Category 1, the Committee largely does not challenge the Government's assertions about the applicability of Exemption 5 to Category 2. And for good reason—these emails meet the requirements for the deliberative process privilege. They are predecisional because the authors sent them before the agency decided how to respond to Twitter's lawsuit. *See Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). And they are deliberative because they include the "give-and-take" of the agency's process; agency personnel gave their opinions on how the agency should respond to the lawsuit. *Id.* The Committee does not question that analysis.

But the Committee does contest the agency's foreseeable harm declaration for Category 2. The agency summarized the harm from disclosure as follows:

> It is crucial for the functioning of government that employees involved in this type of decision-making share their views freely with their colleagues or subordinates and discuss potential adverse or positive implications of any action. If such discussions are routinely disclosed to the public, the individuals making recommendations would not seek guidance from their attorneys, peers, or superiors, and would not share their views for fear that their communications could be published.

Howard 4th Decl. ¶ 47.  To the agency's credit, this explanation comes much closer to a demonstration of foreseeable harm than the explanation in Category 1.  But it still falls short.  No one disputes that the privilege rests on the "obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001).  Likewise, the deliberative process privilege supports the "policy of open, frank discussion between subordinate and chief concerning administrative action."  *EPA v. Mink*, 410 U.S. 73, 87 (1973).

CBP's merely restates those broad justifications for the privilege.  The harm that CBP identifies—the risk that agency officials might not seek guidance or share their views— undergirds the privilege in every case.  *See Nat'l Sec. Archives v. CIA*, 752 F.3d 460, 464 (D.C. Cir. 2014) ("The harm from release [under the deliberative process privilege] is, among other things, the harm to the candor of present and future agency decisionmaking.").  And naturally nondisclosure of officials' opinions is "crucial" to the agency's efficacy; the object of the privilege is "to enhance the quality of agency decisions by protecting open and frank discussion" among agency employees.  *Klamath*, 532 U.S. at 9.  CBP therefore says nothing new about the harm of disclosure and fails to link the possibility of that harm to the information in Category 2.  Instead, the agency repeats the generic rationale for the deliberative process privilege, just as the FBI did in *Reporters Committee*.  *See* 3 F.4th at 370.  Nor again does the context and purpose of these communications suggest a risk of foreseeable harm from disclosure.  The materials in Category 2 must therefore be disclosed.[4]

---

[4]  CBP's explanation flags that Category 2 contains some communications between CBP employees and agency lawyers.  *See* Howard 4th Decl. ¶ 47 ("If such discussions are routinely disclosed to the public, the individuals making recommendations would not seek guidance from their attorneys . . . ").  The Court thinks those communications are better included in Category 5,

**3.**

Category 3 "covers email communications between CBP employees on how to respond to requests for information in relation to the Twitter lawsuit from the DHS Inspector General, Congress, and the media."  Howard 4th Decl. ¶ 48.  These records include "drafts and preliminary versions of responses not yet approved for release" and "back-and-forth discussions about appropriate responses to the requests for information."  *Id.*

As in the previous two categories, the Committee never argues that the entire category of documents does not meet the deliberative process privilege.  Nor could the Committee realistically mount such a challenge.  The eventual response to outside inquiries, whether from Congress, the press, or an inspector general, qualifies as an agency policy.  *See ICM Registry, LLC v. Dep't of Com.*, 538 F. Supp. 2d 130, 136 (D.D.C. 2008).  So discussions about the proper response to those inquiries reflect the give-and-take of an agency's deliberative process.  *See, e.g.*, *Comm. on Oversight and Gov't Reform v. Lynch*, 156 F. Supp. 3d 101, 111–12 (D.D.C. 2016) (finding that deliberative process privilege covered documents revealing internal deliberations about response to press and congressional inquiries).

Yet the larger theme continues here; the Committee argues that CBP fails to establish a risk of foreseeable harm from disclosure.  The Court agrees.  CBP's declaration says the following about the risk of foreseeable harm in Category 3:

> The employees preparing responses to such inquiries must feel candid when they seek input from their colleagues, or individuals working in other CBP offices, in order to create more thorough and fulsome responses while preserving the agencies' operational interests in light of ongoing litigation.

which the Court addresses below.  Thus, the Court's order to disclose Category 2 records applies only to emails that do not meet the description in Category 5.

17

Howard 4th Decl. ¶ 48.  CBP continues to restate the generic rationale for the entire privilege. Agency employees no doubt must "feel candid," otherwise the agency's decisions will be less "thorough and fulsome."  *Id.*  But that is precisely the reason to have this privilege in the first place.  As the Supreme Court has acknowledged, frank discussion of agency matters "might be inhibited if the discussion were made public; and [] decisions and policies formulated would be poorer as a result."  *NLRB*, 421 U.S. at 150.

To be fair, the agency's explanation places this risk in the somewhat specific context of responses to outside inquiries.  Yet the agency identifies no risk that would be specific to that context—the agency is concerned only with a lack of candor affecting agency decisions.  Recall that this rationale undergirds the entire deliberative process privilege, and therefore cannot meet the independent foreseeable harm requirement identified in *Reporters Committee*.  Nor do these communications concern anything like the undercover tactics discussed by the FBI in that case. Thus, the "context and purpose" of the documents in Category 3 does not make "manifest" a risk of foreseeable harm from disclosure.  *See Reporters Comm.*, 3 F.4th at 371.

The records in Category 3 must be disclosed.

### 4.

The analysis of Category 4 follows the familiar pattern of the first three categories. Category 4 "covers email communications between CBP employees about what changes, if any, to make to the existing agency policy on the use of the 19 U.S.C. § 1509 summons."  Howard 4th Decl. ¶ 49.  The category includes "discussions, suggestions, reflections and opinions of individual employees as opposed to the final view of the agency."  *Id.*

The Court is satisfied that these documents qualify for the deliberative process privilege. The emails preceded the agency's decision to update its policy on the summons authority—

making those emails predecisional.  And the various opinions in those emails form an "internal

agency dialogue" about how to modify an agency policy.  *Reporters Comm.*, 3 F.4th at 364.  The

give-and-take of the agency's consultative process includes such a dialogue.  *See Pub. Citizen,*

*Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010) ("To qualify under Exemption 5, a document

must also be a direct part of the deliberative process in that it makes recommendations or

expresses opinions on legal or policy matters.") (internal quotation omitted).  The emails in

Category 4 thus were also deliberative.

But yet again, the agency's foreseeable harm analysis falls short.  CBP explained the

harm of disclosure for this category as follows:

> If these emails were to be disclosed, individuals involved in developing policies may not
> voice their ideas or concerns freely.  Such freedom is imperative for ensuring better
> quality of not only agency policies, but government as a whole.

Howard 4th Decl. ¶ 49.  This explanation resembles that of Category 1:  disclosure might stifle

the ability of certain employees to speak freely and that would weaken agency policies.  *See id.*

¶ 46.  Indeed, no court could disagree with that statement.  But the agency must do more.

The Hardy Declaration in *Reporters Committee* included a similar assertion about agency

personnel being "more circumspect" in expressing their opinions, which would "impede the

fulsome discussion of issues necessary to reach a well-reasoned decision."  *Reporters Comm.*, 3

F.4th at 370.  The D.C. Circuit rejected that as a "wholly generalized and conclusory" assertion

of harm.  *Id.*  This Court likewise holds that CBP did not demonstrate a sufficient risk of

foreseeable harm from disclosure of the records in Category 4.  Nor can the Court say that

communications about an updated summons directive make "manifest" a risk of foreseeable

harm without a better explanation from CBP.  *Id.* at 371.

The agency must therefore disclose those records.

**5.**

CBP's fifth category of withheld documents relies not on the deliberative process privilege, but on the attorney-client and attorney work-product privileges. The Government asserts that Category 5 "covers confidential communications between DHS and CBP attorneys, and CBP attorneys and CBP employees, about the Twitter lawsuit and the agency's use of the 19 U.S.C. § 1509 summons authority. These include emails where CBP employees are seeking legal advice and CBP attorneys provide advice." Howard 4th Decl. ¶ 50. The category also encompasses "discussions between DHS and CBP attorneys . . . about the scope of 19 U.S.C. § 1509, the proper interpretation of that statute, and the advice to convey to the client." *Id.*

Unlike the first four categories, the Committee begins with a categorical challenge to the agency's withholding under the attorney-client privilege. According to the Committee, the redactions of names leave unanswered who sent or received the emails, whether those emails included any non-agency personnel, and thus whether the privilege might have been waived through disclosure outside the attorney-client relationship.

CBP has established confidentiality across the category of documents. Its declarations state that the emails are confidential and include instances when agency employees "[sought] legal advice and CBP attorneys provided advice," as well as times agency lawyers discussed statutory advice to convey to the client. Howard 4th Decl. ¶ 50. That assertion, along with the presumption of good faith that the Court affords agency declarations, *see Safecard Servs., Inc.*, 926 F.2d at 1200, goes a long way to show confidentiality. *See, e.g.*, *Watkins Law & Advocacy, PLLC v. Dep't of Veterans Affairs*, 412 F. Supp. 3d 98, 112–13 (D.D.C. 2019).

More, the agency's *Vaughn* Index notes when emails originate in the CBP Office of Chief Counsel and are sent in response to agency requests for legal advice. *See FTC v.*

*Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018) ("The privilege covers [] those communications in which an attorney gives legal advice . . . .). Thus, the documents in Category 5 (as described by the agency), relate to legal matters for which the agency "has sought professional advice" from its lawyers. *Mead Data Cent. v. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977); *see also Tax Analysts*, 117 F.3d at 618 ("The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services."). The attorney-client privilege protects such communications.

To show a lack of confidentiality, the Committee highlights one document. FOIA0040–0045 is an email chain about Twitter's lawsuit against the agency. *See* Townsend 2nd Decl., Ex. B at 2–7. A journalist asked for a comment on the suit, and a CBP official forwarded the request to at least one CBP lawyer, noting that the agency would respond that it could not comment on pending litigation. *See id.* at 7. Later on, the same CBP official asked the Office of Chief Counsel to brief the Commissioner on the suit. *See id.* at 6. An associate counsel responded with a proposed date and referenced a "summary," which presumably accounts for the redaction on that page. *Id.* at 5.

The Committee contends that CBP has not shown that confidentiality was expected in the handling of this advice on how to respond to a media request. The Court disagrees because the purported legal advice was not "designed to be disclosed to a third party." Pl.'s MSJ at 29 (citing *Jud. Watch v. USPS*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004)). In fact, the unredacted emails already include the agency's response to the media inquiry. Even though the discussion was about a statement that would be publicized, the exact contents of and deliberations preceding it qualify as a protected attorney-client communications. *See Comp. Enter. Inst. v. EPA*, 232 F.

Supp. 3d 172, 188 (D.D.C. 2017) (protecting emails between agency lawyers and staff where the "primary purpose[] of the emails was to obtain legal advice concerning the legal risks of the various options for a public statement").

The agency fares less well, however, in its redactions to certain PowerPoint presentations. CBP withheld excerpts of PowerPoint presentations on recordkeeping, use of the summons authority, and the False Claims Act. *See* Townsend 2nd Decl., Ex. C at 7–38, 44–76, 112–151. The agency asserts in the Index that all withheld material involved "legal advice" or "legal guidance" and was thus privileged. *Vaughn* Index at 55 (entry for FOIA1475–1506), at 72 (entry for FOIA2268–2300), and at 95 (entry for FOIA3790–3829).

Assuming the agency is correct, that guidance arose in training presentations meant for distribution wider than discrete chains of back-and-forth emails between agency employees and agency lawyers. CBP must therefore say why these training materials were limited in their distribution. The agency did so in *National Security Counselors v. CIA*, 206 F. Supp. 3d 241, 286 (D.D.C. 2016), a case relied on by CBP. There, the plaintiff challenged the withholding of certain portions of agency training materials. The court affirmed the nondisclosure, noting that the agency's declaration had specifically stated that the materials "were not shared beyond the parties." *Id.*

The agency here makes no similar statement and fails even to mention whether these training presentations were bound for a limited audience.[5] CBP cannot carry its burden without

---

[5] The agency also asserts that the attorney work-product privilege applies to these records. *See* Defs' Reply at 16. But CBP fails to discuss at all how training materials for such a wide audience could be prepared "in anticipation of litigation." *Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 250.

more.  Thus, the agency's asserted Exemption 5 redactions for pages 1492, 1498, 2281, 2283, 2290, 2294, 2296–99, 3810, 3819, 3824, and 3828 will be disclosed.

The parties also dispute the agency's withholding in full of an attachment to an email sent between lawyers in CBP's Office of Chief Counsel.  According to CBP, the attachment is a legal memorandum from 1997 relating to "CBP's seizure authorities of prohibited merchandise with a value of under $500,000."  Fifth Declaration of Patrick Howard ¶ 8 ("Howard 5th Decl."), ECF No. 63-2.  A senior agency attorney sent this attachment to a junior attorney as "useful information" for the latter attorney's memo on CBP's 19 U.S.C. § 1509 authority.  *Id.*  The government asserts that the document qualifies for both the attorney-client privilege and the work-product privilege.[6]

The Court agrees with the Committee that the agency has not justified those privileges for the 1997 memo.  CBP tells the Court only that the attachment provides "legal advice."  *Id.*  What CBP does not say is whether agency lawyers provided that 1997 guidance to "protect [the agency's] interest" as part of some dispute or as a "neutral, objective analys[i]s" of an agency statute.  *Coastal States*, 617 F.2d at 863.  That distinction matters because the latter does not receive protection under the privilege.  *See id.*  Because CBP does not explain this aspect of the memorandum's nature, the agency has failed to justify withholding the 1997 memo under the attorney-client privilege.  *See Machado Amadis v. Dep't of Just.,* 388 F. Supp. 3d 1, 11 (D.D.C. 2019) ("the responding federal agency bears the burden of proving that it has complied with its

---

[6]  The *Vaughn* Index also says that CBP asserts the deliberative process privilege.  *See* Vaughn Index at 28 (entry for FOIA00478–00506).  But that Index entry is for the entire email chain.  CBP clarified in a supplemental declaration that, for the 1997 memo, the agency relies only on the attorney-client and work-product privileges.  *See* Howard 5th Decl. ¶ 8.

obligations under FOIA."), *aff'd sub nom. Amadis v. Dep't of State,* 971 F.3d 364 (D.C. Cir. 2020).

As for the work-product privilege, CBP does not say whether the 1997 memo was prepared in anticipation of litigation. *See Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 250. True, the attachment emerges amid a flurry of emails between lawyers worried about Twitter's response to the summons. The Court does not doubt—and the Committee gives no argument otherwise—that those emails reflect the "mental impressions" of agency lawyers worried about possible litigation with Twitter. *Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *see also Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 370 (D.C. Cir. 2005) (holding that contents of emails sent among agency lawyers qualified for the work-product privilege). But someone wrote the 1997 memo well before the prospect of litigation with Twitter. And the Government does not say whether that earlier author contemplated litigation when writing the memo. The Court cannot fill in that detail for the agency. Thus, CBP will release the 1997 memo.

Lastly, the Committee challenges the agency's demonstration of foreseeable harm for this category. Before the Court resolves that dispute, some background is necessary. The D.C. Circuit has explicated the foreseeable harm requirement only in relation to the deliberative process privilege. *See Reporters Comm.*, 3 F.4th at 361; *Amadis*, 971 F.3d at 370. Such a limited focus in the caselaw does not cabin the requirement to that privilege—indeed, nothing in the provision's text limits it to any one exemption. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) ("every word and every provision" of a statute "is to be given effect"). But Congress added the foreseeable harm requirement specifically to limit "agency overuse and abuse of Exemption 5 and the deliberative process privilege." *Reporters Comm.*, 3 F.4th at 369. So an agency's burden under the foreseeable harm requirement may be more easily met when invoking

other privileges and exemptions for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated.

Take the attorney-client privilege withholdings here.  The agency's declaration says:

> Routine disclosure of information protected by attorney-client and/or attorney work product privilege would shake the very foundation of the legal profession, as clients would not feel comfortable asking for advice and attorneys would not feel comfortable providing it.

Howard 4th Decl. ¶ 50.  Although the agency's language may be overwrought, the attorney-client privilege holds a prominent and sacrosanct role in the law.  *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) ("The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law.").  Release of attorney-client communications would undoubtably undermine our legal culture.  Agencies would lose an important tool in their decisionmaking process—employees' ability to confidentially consult agency lawyers.

More, the "observance of law" otherwise promoted by the privilege would be hampered during agency decisionmaking.  *Id.*  Courts have long recognized that confidentiality encourages clients to consult counsel before embarking on a potentially illegal venture.  *See Fisher v. United States*, 425 U.S. 391, 403 (1976) ("The purpose of the privilege is to encourage clients to make full disclosure to their attorneys.").  That rationale and benefit is especially applicable for federal officials making policy decisions.  Thus, the law already acknowledges and guards against the risk of harm that would come from disclosing attorney-client communications.  And CBP has articulated a fairly non-generalized description of that risk.  That is good enough.

The record here—as well as the agency's explanation—therefore shows that disclosure of the communications in Category 5 would impair the relationship between an agency and its attorneys.  *Accord Machado Amadis,* 388 F. Supp. 3d at 20 (finding agency's concern about

potential chilling effect of disclosure of attorney work product sufficient to show foreseeable harm).  The agency must disclose from this category only those specific documents that the Court has mentioned.

**6.**

Category 6 "covers the various drafts, and related email communications, about the updated 19 U.S.C. § 1509 summons directive."  Howard 4th Decl. ¶ 51.  CBP attests that the drafts include "contextual recommendations, comments, and redline edits made by individuals from various CBP offices that convey the authors' opinions regarding the draft language."  *Id.*  CBP asserts the deliberative process privilege for those drafts.  The agency also notes that some drafts contain comments and edits made by CBP attorneys about the legal sufficiency of the directive.  The agency justifies withholding of those specific drafts under the attorney-client and attorney work-product privileges.

The Committee responds that CBP has reflexively withheld drafts without showing that the drafts are predecisional.  The Committee hypothesizes that "some or all of these records may have lost their predecisional status due to their adoption by the agency."  Pl.'s MSJ at 21.  The Court agrees with the Committee, as has the Circuit for many years, that draft documents are not presumptively privileged.  *See Dudman Commnc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987).  But the Committee misplaces the burden here.  Whereas the agency usually holds the burden to show why an exemption applies, the requester bears the burden to show why "an otherwise predecisional and deliberative document has lost its privileged status through adoption."  *Gellman v. Dep't of Homeland Sec.*, 525 F. Supp. 3d 1, 7 (D.D.C. 2021); *see also McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 849 F. Supp. 2d 47, 63 n.14 (D.D.C. 2012).

The Committee speculates that CBP might have adopted some drafts but cannot confirm that speculation with a single document from the *Vaughn* Index.  True, some courts have asked an agency to say proactively whether it has adopted a draft.  *See, e.g.*, *Heffernan v. Azar*, 317 F. Supp. 94, 125–26 (D.D.C. 2018).  But those cases guard against the Government using the "draft" label as a "get-out-of-FOIA-free card."  *Gellman*, 525 F. Supp. 3d at 8.  They do not conflict "with the general rule that plaintiffs bear the burden to prove that a document has lost its predecisional status through adoption."  *Id*.

More, CBP has met its burden to show that these drafts qualify for the privilege.  CBP declares that the drafts contain various deliberative thoughts from agency employees (a fact not rebutted by the Committee), and the parties agree that CBP ultimately issued an updated directive.  CBP has therefore shown a "logical" application of the deliberative process privilege to these draft documents.  *Larson v. Dept of State*, 565 F.3d 857, 862 (D.C. Cir. 2009).  In contrast, the Committee has done nothing but speculate.  Thus, the drafts in Category 6 qualify for the deliberative process privilege.[7]

> As to the foreseeable harm from disclosure of the records in this category, CBP states:
>
> Disclosure of the evolving iterations of the directive, and the communications discussing the drafts, would allow a reader to probe too deeply into the thought processes of the drafters and would have a chilling effect on communication between agency employees. Further, disclosure of the editorial process would stifle the creative thinking and candid exchange of ideas necessary to produce government policies and run a substantial risk of confusing the public, and/or intruding on the deliberative process of the agency.

Howard 4th Decl. ¶ 51.

This explanation barely carries CBP's burden.  The agency lists many of the generalized rationales for the privilege—stifled creative thinking, candor among employees, and a chilling

---

[7]  This holding also applies, for the reasons stated in the Court's analysis of Category 5, to any comments from agency attorneys withheld under the attorney-client privilege.

effect on intra-agency communication.  But CBP also worries that disclosure would confuse the public.  The Court agrees that this is a foreseeable risk of harm for this category.  To disclose drafts of the directive risks that the public might mistake those preliminary thoughts for the agency's actual policy.  *See, e.g.*, *Leopold v. DOJ*, No. 19-2796, 2021 WL 3128866 at *5 (D.D.C. July 23, 2021).  The Committee rejects this notion, but the D.C. Circuit has long recognized that the risk of public confusion "has a special force with respect to disclosures of agency positions or reasoning concerning proposed *policies.*"  *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1436 n.10 (D.C. Cir. 1992) (emphasis in original).

CBP contemplated just such a policy with the updated summons directive.  More, the agency specifically linked these harms to "the editorial process," a more identifiable and special part of agency decisionmaking than what has been mentioned in prior categories.  True, the insufficient explanation for Category 2 likewise discusses "the *policy* reached by the agency" when it withdrew the Twitter summons.  Howard 4th Decl. ¶ 47 (emphasis added).  But the Court finds a significant difference between a written agency policy like the summons directive and one isolated action taken by the agency.  *Cf. Hardy v. ATF*, 243 F. Supp. 3d 155, 176–76 (D.D.C. 2017) ("Here, [the agency] is not promulgating a 'policy,' it has merely released a report about the adequacy of another agency's record-keeping.").  The written nature of the summons directive risks that the public might erroneously think that a prior draft is an official agency policy.  No such risk attends a decision by CBP to withdraw a summons.

A similar rationale distinguishes the drafts here from the draft IG report in *Reporters Committee*.  The FBI asserted that disclosure of that draft report "would potentially confuse the public about the reasons for the [IG's] actions."  *Reporters Comm.*, 3 F.4th at 371.  The court rejected that assertion as a basis of foreseeable harm.  But IG reports do not set agency policy,

they analyze it.  Thus, the risk of public confusion from an IG report has less force than the policy drafts that comprise this category.

The Court therefore accepts the agency's declaration on the foreseeable harm that might result from disclosure of the drafts in Category 6.  CBP need not disclose this material.

**7.**

Category 7 "contains email communications between CBP attorneys and CBP employees about how to process" the Committee's FOIA requests.  Howard 4th Decl. ¶ 52.  Those include "deliberative discussions between CBP employees about how to handle the requests."  *Id.*  The agency asserts that the deliberative process privilege and the attorney-client privilege justify withholding this category of documents.  The Committee does not challenge the agency's reliance on those privileges as a categorical matter.

The Court is satisfied that both privileges apply to this category.  Discussions about how to handle a FOIA request are predecisional because they occur before the decision to respond to the request.  *Machado Amadis*, 388 F. Supp. 3d at 19 (finding FOIA "Blitz Forms" to be predecisional).  CBP also describes those conversations as "deliberative," a fact that the Committee does not dispute.  As for the discussions between the agency lawyers and agency employees, the Court has no reason not to apply its reasoning from Category 5 to those communications in Category 7.

The Committee does challenge, however, individual withholdings that likely fall into this category.  The first is FOIA1538–1540, a "document log created by [a] FOIA analyst."  *Vaughn* Index at 63.  The Committee argues that the agency makes no showing that the withheld material "makes recommendations or expresses opinions on legal or policy matters."  Pl.'s MSJ at 21. The Court agrees.  The agency states only that the log contains the analyst's "notes with respect

to the processing of" the Committee's requests.  Defs' Reply at 12.  That says nothing about whether the notes include the type of opinions and recommendations that the privilege protects. The notes might discuss, for instance, the progress of the analyst's review, not the analyst's personal opinions about the proper way to conduct the FOIA search.  *See Coastal States*, 617 F.2d at 866 ("The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.").

CBP responds that Exemption 5 covers the log because the analyst apparently processes and prepares the release package for a supervisor, including the log.  *See* Defs*.*' Reply at 11-12. And, according to CBP, "recommendations from subordinates to superiors lie at the core of the deliberative-process privilege."  *Id.*  (quoting *Amadis*, 971 F.3d at 370).  The Court does not quibble with that statement.  But the agency has not confirmed that this particular log contained any recommendations or opinions.  Indeed, the Fifth Howard Declaration suggests that the log was made for the analyst's benefit, not a supervisor's.  *See* Howard 5th Decl. ¶ 11 ("The FOIA log is a chart detailing the notes taken by the FOIA specialist while processing the FOIA request, *to assist the FOIA specialist* with the tracking of the search and other matters related to the processing of the request.") (emphasis added).  That a superior might review the notes from the analyst buttresses the predecisional nature of the document.  *See Access Repts. v. DOJ*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) ("A key feature under both the predecisional and deliberative criteria is the relation between the author and recipients of the document.").  But the mere fact of review by a superior does not transform nondeliberative comments into deliberative ones.  CBP simply has not provided the Court with a sufficient basis to conclude that this document contains deliberative content.  Thus, the FOIA log will be released in full.

The same analysis mandates the release of FOIA1544, an "email between CBP FOIA employees." *Vaughn* Index at 63. CBP applied the deliberative process privilege to discussions "regarding the review process for records being released under FOIA." *Id.* The agency says nothing more about this email, which means the Court has no idea whether the discussions contained there are deliberative. *Cf. Comp. Enter. Inst.*, 232 F. Supp. 3d at 186–87 (exempting from disclosure emails among agency FOIA staff where the agency said the emails contained "a discussion among staff members seeking to clarify the request for information" (cleaned up)). In fact, CBP does not even respond to the Committee's arguments that the agency improperly withheld this allegedly deliberative material. The agency thus has not carried its burden, and the material withheld on that document under Exemption 5 should be released.

Beyond these individual documents, the agency's showing of foreseeable harm for this category is much briefer than for other categories:

> Disclosing this information would undermine the deliberative process privilege and the attorney-client privilege, and would have a chilling effect on communication between agency employees who regularly process FOIA requests.

Howard 4th Decl. ¶ 52. This explanation differs slightly from previous explanations in that CBP mentions two privileges. CBP has not shown enough for either privilege.

For the deliberative process withholdings, CBP says only that disclosure would "undermine the deliberative process" and "would have a chilling effect" on CBP employees who process FOIA requests. Howard 4th Decl. ¶ 52. CBP therefore offers nothing beyond the "generic rationales" for the privilege itself. *Reporters Comm.*, 3 F.4th at 370. Those conclusory statements do not meet the agency's burden. And the record does not show that these internal discussions about FOIA processing implicate any sensitive context that would make obvious a risk of harm from disclosure.

CBP says even less on the attorney-client privilege, noting only that disclosure would "undermine the attorney-client privilege." Such a conclusory statement again does not suffice to show a risk of foreseeable harm. True, the Court has already said that establishing the attorney-client privilege will go a long way to show the risk of foreseeable harm. *See supra.* But an agency must still provide a non-generalized explanation on the foreseeable harm that would result from disclosure of attorney-client communications. CBP has barely provided any explanation at all.

More, the record shows no obvious reason why disclosing these records would create a foreseeable harm. The agency describes most of the attorney-client records withheld in this category as discussions between CBP lawyers and FOIA employees about "the search for responsive records," *Vaughn* Index at 58 (entries for FOIA001438–48), and "the processing of records being requested," *Vaughn* Index at 64–66 (entries for FOIA001580–91, FOIA001601–36, FOIA001644–45, FOIA001647–64). Such a vague description covers substantive legal discussions with attorneys about processing, the disclosure of which would threaten attorney-client communications.

But that description also covers more minor communications, disclosure of which would have less dire consequences, if any. The Court thus cannot know which type of discussions have been withheld, and accordingly cannot say that the risk of disclosure is "manifest" on the record. *See Reporters Comm.*, 3 F.4th at 371. CBP could have made that risk clear if it had provided an explanation beyond the five words "would undermine the attorney-client privilege."[8] But based

_____

[8] That cursory explanation distinguishes this category from Category 5, which at least provided some explanation for why the attorney-client communications would be harmed by disclosure. CBP might also argue that these communications should be shifted to Category 5, much like the Court did for the attorney-client records in Category 2. The Court took that action because the description of records in Category 2 mirrored the description for Category 5. Both categories

on the agency's boilerplate explanation and the *Vaughn* Index, the Court finds that CBP has not shown a risk of foreseeable harm from disclosing these attorney-client communications.  Thus, CBP must disclose all material in Category 7.

The Court has repeatedly found CBP's explanations as to the risk of foreseeable harm to be wanting here.  The agency could have said more, and it likely would have met its burden in many categories if it had done so.  To be sure, the D.C. Circuit released *Reporters Committee* after dispositive briefing had concluded in this case.  But the D.C. Circuit had already issued *Amadis*, which explicitly credited the notion that agencies "cannot simply rely on generalized assertions."  971 F.3d at 371.  CBP seems to have paid little attention to that decision.  And multiple district court decisions, including one involving CBP, had already rejected similar explanations from agencies.  *See, e.g.*, *Ctr. for Invest. Reporting*, 436 F. Supp. 3d at 106–07.  More, the agency never sought to update its declarations or provide supplemental briefing, nor did it respond when the Committee notified the Court about *Reporters Committee*.   In short, CBP had opportunities to say more.  But it never did.  This is now CBP's second attempt at summary judgment, and the Committee deserves resolution and vindication in the face of CBP's lackluster efforts to live up to its statutory obligations.

## B.

Turning to other withholdings, CBP also redacted the name of many agency employees. Specifically, CBP disclosed the names of "DHS and CBP senior leadership," but withheld the names of all other non-public facing employees, including law enforcement officers.  Howard

---

dealt with Twitter's lawsuit.  *See* Howard 4th Decl. ¶¶ 47, 50.  Thus any attorney-client communications in Category 2 belonged in Category 5.  Such a transfer would not work for the attorney-client records in Category 7, which considered a different and more routine subject matter than Categories 2 and 5.

4th Decl. ¶ 53.  CBP also withheld the email addresses and phone numbers of those individuals but released their titles and positions.  *See* Howard 5th Decl. ¶¶ 13–14.  The agency justified these withholdings under Exemptions 6 and 7(C).  The Committee challenges only the withholding of names.  *See* Pl.'s MSJ at 32, n.6.

Exemptions 6 and 7(C) permit an agency to withhold personally identifiable information, though the language for each exemption differs slightly.  Exemption 6 withholds "personnel and medical files and similar files the disclosure of which *would* constitute a *clearly unwarranted* invasion of personal privacy*."  5 U.S.C. § 552(b)(6) (emphases added).  Exemption 7(C) applies only to information "compiled for law enforcement purposes," the disclosure of which "*could reasonably be expected to constitute* an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C) (emphasis added).  Courts have noted these linguistic variations.  *See Nat'l Archives & Recs. Admin v. Favish*, 541 U.S. 157, 165–66 (2004).  Based on those differences, the standard for disclosure under Exemption 7(C) is "somewhat broader" than the standard under Exemption 6.  *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989).

CBP asserts that it is a law enforcement agency and thus that it compiled the withheld records for law enforcement purposes.  *See* Defs' MSJ at 20–21.  Not only does the Court treat that assertion with some deference, *see Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002), the Committee does not dispute it.  So the Court need only consider whether the agency properly invoked Exemption 7(C).  *See ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011).  Under that exemption, the Court balances CBP's asserted privacy interest "against the public interest in disclosure."  *Favish*, 541 U.S. at 171.

The agency presents a more than cognizable privacy interest here.  The D.C. Circuit has "consistently supported the nondisclosure of names or other information identifying individuals

that appear in law enforcement records," including investigators.  *Schrecker v. DOJ*, 349 F.3d

657, 661 (D.C. Cir. 2003).   That is partially because individuals, whether they be "suspects,

witnesses, or investigators," have a "strong interest" not to be "associated unwarrantedly with

alleged criminal activity."  *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990).  And that

interest makes much sense—individuals associated with an unpopular agency action might be

subject to public scrutiny and perhaps harassment.  *See Lesar v. DOJ*, 636 F.2d 472, 487 (D.C.

Cir. 1980) (holding that government agents "have a legitimate interest in preserving the secrecy

of matters that conceivably could subject them to annoyance or harassment in either their official

or private lives").  Courts in this district have recognized that risk as a firm basis for a strong

privacy interest.  *See, e.g.*, *Jud. Watch, Inc. v. Dep't of State*, 875 F. Supp. 2d 37, 47 (D.D.C.

2012).

    CBP has shown such a risk here.  As CBP describes, identifying non-public facing CBP

employees in an operational context "risks the unwarranted attribution and attention to the

employee beyond the confines of their job and into their personal life."  Defs' MSJ at 23.  In fact,

CBP cites multiple instances where its employees have experienced harassment solely based on

their employment with CBP.  *See* Howard 4th Decl. ¶ 56.  These instances include vandalism of

multiple CBP vehicles, threats sent to Border Patrol agents by fax, and social media threats to

douse CBP officers with acid.  And according to news reports provided by the agency, all CBP

employees in Portland, Oregon, must hide their CBP affiliation out of fear that their personal

information will leak online.[9]

---

[9]  *See* Chantal Da Silva, *CBP Chief Says Feds Don't Wear Name Badges Due to Fears of Being
'Doxxed'*, Newsweek (July 23, 2020, 11:42 AM), https://www.newsweek.com/cbp-chief-says-
feds-dont-wear-name-badges-due-doxing-1519994.

The Committee downplays these concerns and argues that CBP has merely applied a per se rule of nondisclosure for the names of agency employees.  The Court disagrees—the law might "disfavor" the blanket withholding under Exemption 7(C) of the names of agency employees, *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984), but a real threat (rather than a speculative one) to the privacy of agency employees will justify withholding of names, *see Elec. Priv. Info. Ctr.*, 384 F. Supp. 2d at 116 (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 380 n.19 (1976)).  The incidents reported by CBP—all of which occurred during this litigation—show a real threat to the employees' privacy.  Those CBP employees therefore have a strong privacy interest in their identities.

On the other side of the equation, the Committee asserts a public interest in disclosing CBP's "improper efforts" to use its summons authority to compel Twitter to unmask an account.  Pl.'s MSJ at 35.  The Court accepts that as a significant public interest under Exemption 7(C).  *See Favish*, 541 U.S. at 173 (accepting that whether agency "acted negligently or otherwise improperly in the performance of [its] duties" is a significant public interest under Exemption 7(C)).

Yet the Committee has not shown how that public interest outweighs the employees' privacy interest.  "The *only* relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to."  *Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994) (emphasis added).  Knowledge of the employees' names would not matter here.  The Twitter summons is already in the public domain, as is the Inspector General's report on how CBP used its summons authority in its dealings with Twitter.   The Committee offers no suggestion as to how knowing names alone will clarify the agency's

activities, particularly after public dissemination of the summons and the IG Report.[10]   The Court

therefore finds that the agency properly invoked Exemption 7(C) for the names of almost all

CBP non-public facing employees.  *See SafeCard Servs.*, 926 F.2d at 1206 ("[U]nless access to

the names and addresses of private individuals appearing in the files within the ambit of

Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is

engaged in illegal activity, such information is exempt from disclosure."); *see also Beck v. DOJ*,

997 F.2d 1489, 1493 (D.C. Cir. 1993) ("Information that reveals little or nothing about an

agency's own conduct does not further [FOIA's] purpose . . . .").

      That holding does not apply, however, to the agency's redactions of the names of Special

Agent Adam Hoffman and Special Agent in Charge Stephen Caruso.  Their names appeared on

the Twitter summons and in the subsequent litigation.  Their involvement with the summons

therefore exists in the public domain, and CBP cannot withhold such public information under an

otherwise valid exemption claim.  *See Davis v. DOJ*, 968 F.2d 1276, 1279 (D.C. Cir. 1992).

Thus, CBP will remove any redactions of the names of Hoffman and Caruso in its next

production to the Committee.

      Like the withholdings under Exemption 5, the agency must establish a foreseeable harm

from disclosure of these names.  CBP says disclosure of names would cause invasions of privacy

for many CBP employees.  That assertion would likely be enough to meet the agency's burden.

*See, e.g.*, *Ecological Rights Found. v. EPA*, — F. Supp. 3d —, 2021 WL 2209380 at *20 (D.D.C.

Jun. 1, 2021).  But the agency goes beyond that relatively generalized assertion and cites specific

examples of harassment and threats against CBP employees.  *See* Howard 4th Decl. ¶ 56.  These

---

[10]   Other material withheld by CBP and requested by the Committee likely would help clarify the
agency's actions.  But CBP withholds only the names under Exemption 7(C).

examples explain in a "focused and concrete way" how disclosure of the names would harm CBP employees. *Reporters Committee*, 3 F.4th at 369. CBP has shown a risk of foreseeable harm.

The Court holds that CBP correctly withheld the names of all non-public-facing employees, except for Agents Hoffman and Caruso.

### C.

CBP also withheld records under Exemption 7(E). That exemption permits withholding of "information compiled for law enforcement purposes" when release of that information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). This exemption "sets a relatively low bar" to justify withholding of material; the agency need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). Any information that "could increase the risks that a law will be violated" will be protected from disclosure. *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).

What an agency must do to show foreseeable harm under Exemption 7(E) is an open question. The D.C. Circuit's cases about the foreseeable harm requirement have exclusively discussed Exemption 5. *See Reporters Comm.*, 3 F.4th at 361; *Amadis*, 971 F.3d at 370. Recall, however, that fulfilling the terms of other privileges or exemptions goes a long way to meeting the foreseeable harm requirement. Exemption 7(E) is one such exemption. As other courts have acknowledged, Exemption 7(E) by its own terms already requires that an agency show a risk of foreseeable harm. *See Reporters Comm. for Freedom of the Press v. FBI*, — F. Supp. 3d —,

2021 WL 2913078 at *6 (D.D.C. July 12, 2021); *CREW v. DHS*, 525 F. Supp. 3d 181, 192 & n.4 (D.D.C. 2021). The text of 7(E) allows withholding only when the withheld material "could reasonably be expected to risk" circumvention of the law. Put differently, an agency must show some risk of circumvention before withholding material under 7(E). The exemption's text thus already forces the agency to show some risk of harm.

The Court accepts the Committee's response that the freestanding foreseeable harm requirement in 5 U.S.C. 552(a)(8) can still guard against general explanations and boilerplate language used to justify withholdings. *See* Plaintiff's Reply at 13, n.1 ("Pl.'s Reply"), ECF No. 64. But the Court is also mindful of the D.C. Circuit's reasoning in *Reporters Committee*, which relied on the "context and purpose" of certain communications to show a risk of foreseeable harm. *Reporters Comm.*, 3 F.4th at 372.

With those principles in mind, the Court turns to the information withheld under this exemption. CBP invoked Exemption 7(E) on four categories of information. The Committee challenges only three.

## 1.

The first category covers the techniques and procedures that CBP uses "to investigate unauthorized disclosure of information and cybersecurity threats." Howard 4th Decl. ¶ 59. According to CBP, these records include the techniques used by CBP to investigate whether the unauthorized release of internal emails occurred because of "misconduct by a CBP employee" or "a compromise in the security systems." *Id.* The agency asserts that this information "could be exploited and used to develop and employ countermeasures to diminish the effectiveness of CBP's cybersecurity and counterintelligence measures." *Id.*

The Committee argues that the agency provides a "near-verbatim recitation of the statutory standard" and fails to explain logically how these records might create circumvention of the law.  Pl.'s MSJ at 38.  Not so.  CBP set forth the exact types of techniques it seeks to protect—those procedures used to investigate cybersecurity threats and disclosure of internal information.  Those specific procedures are hardly a verbatim recitation of the statute.  *Compare Blackwell*, 646 F.3d at 42 (upholding nondisclosure where FBI withheld "details about procedures used during the forensic examination of a computer by an FBI forensic examiner") *with CREW*, 746 F.3d at 1102 (requiring disclosure where FBI wished to protect "procedures and techniques used by FBI agents during the investigation" but identified no specific procedures).  And disclosure would logically lead to an obvious harm:  Bad actors would know how CBP responds to cybersecurity threats.  With that information, outsiders might tailor their activities to exploit vulnerabilities in the agency's detection and investigation techniques.

CBP readily establishes this possible circumvention in FOIA1291–1313, which the agency partially withheld under this exemption.  *See Vaughn* Index at 52-53; *see also* Townsend 2nd Decl., Ex. D at 7–29, ECF No. 60-7.  Those pages are emails from the agency's IT office, containing "summaries put together at the end of each shift providing progress for each ongoing investigation related to breaches of CBP systems."  Howard 5th Decl. ¶ 15.  One such investigation covered in these emails was whether the @alt_USCIS Twitter account had released intra-agency communications.  *See id.*  And these emails include the steps taken to determine whether a breach has occurred.  As the agency says, such information "would provide a play-by-play guide to potential bad actors" into CBP's procedures.  *Id.*  Those bad actors could "employ countermeasures" to cloak their activities from detection.  *Id.*  The Committee does not challenge these withholdings in its reply brief, nor says there why the records in Category 1 do not qualify

for Exemption 7(E).  *See* Pl.'s Reply at 28.  The Court agrees with the agency's invocation of the exemption for this category.

As to foreseeable harm, the Committee argues that the agency gives only a boilerplate recitation of the foreseeable harm standard.  *See* Pl.'s Reply at 14.  The Court disagrees.  The information withheld in this category shows step-by-step how CBP investigates potential cyber vulnerabilities.  The "very nature" of such sensitive information conveys a risk of harm from disclosure.  *Reporters Comm.*, 3 F.4th at 372.  And as described above, the agency's declarations have explained that risk.  The Court is satisfied that CBP has established a risk of foreseeable harm for this category.

CBP therefore properly withheld the documents in this category.

**2.**

The second category of information withheld under Exemption 7(E) details the "techniques and procedures CBP uses to conduct internal investigations."  Howard 4th Decl. ¶ 60.  Those include the procedures that the agency "routinely use[s]" and "non-public details about when, how, and under what circumstances" the agency employs each procedure.  *Id.*  CBP says that if the public learned about the circumstances in which the agency uses these various techniques, "bad actors will learn information that they can use to avoid law enforcement consequences."  *Id.* ¶ 61.

The Committee dismisses those statements as "boilerplate representation[s]" that do not show logically how the disclosure of these records would risk circumvention of the law.  Pl.'s MSJ at 39.  The Court agrees that CBP has not provided much on the applicability of Exemption 7(E) to this category.  But the agency has identified the procedures that would be harmed by

disclosure (the internal investigatory procedures), and the documents themselves highlight the risk of circumvention should those procedures be disclosed.

Consider FOIA1034–1038, an "internal email communication," *see Vaughn* Index at 45, which includes information about "what steps [CBP's Office of Professional Responsibility] would normally take in an internal investigation involving a cybersecurity breach."  Howard 5th Decl. ¶ 16.  The Committee again dismisses the agency's assertion that this information could circumvent the law.  *See* Pl.'s Reply at 28.  But why?  A disgruntled employee who wished to leak CBP's proprietary information from the inside could, based on the disclosure of how CBP investigates internal misconduct, exploit CBP's procedures to avoid detection.  That information "would inform individuals on the types of activities that trigger a full investigation" and would cause those individuals to "adjust their behavior accordingly," thereby prompting circumvention of the law.  Defs' MSJ at 25-26.  And the sensitive context of this information—the details about how CBP conducts internal investigations of cybersecurity breaches—shows a risk of foreseeable harm.  *See Reporters Comm.*, 3 F.4th at 372.

The Court therefore affirms CBP's withholding of the records in Category 2.

### 3.

The third category of material withheld under this exemption "covers techniques and procedures related to the issuance or non-issuance of administrative summonses in specific investigations, some of which may be ongoing."  Howard 4th Decl. ¶ 62.  CBP withheld "dates of investigations, PII on the individuals being investigated, circumstances of the alleged misconduct, location of the individual, whether large criminal activity was implicated, and specific techniques or procedures used to further the investigation."  *Id.*  CBP asserts that disclosure of this material would risk circumvention of law because individuals would know (1)

which activities trigger a full investigation rather than a preliminary one; (2) the dates covered by a particular investigation; and (3) CBP's investigative techniques.  *See id.*

The Committee responds that Exemption 7(E) applies only to "information and techniques that are secret and not generally known to the public."  Pl.'s Reply at 29.  According to the Committee, CBP's summons authority is well known and therefore not eligible for protection from disclosure.  The Court disagrees.  Even if the public knows of CBP's authority under § 1509, the Committee has not shown that the public knows anything about the finer details of that authority, such as when and how CBP relies on it.  Such information merits protection from disclosure under Exemption 7(E).  *See Shapiro*, 893 F.3d at 801 (affirming nondisclosure of information in FBI database when the public knew of database's capabilities but agency's "methods of managing the database [were] not generally known"); *see also Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (citing *Blanton v. DOJ*, 64 F. App'x 787, 788–89 (D.C. Cir. 2003) (explaining that exemption applies to "confidential details of a program whose general contours [are] publicly known)).

More, release of those details—the exact type of information covered by this category— would divulge how CBP uses summonses to advance its mission.  As CBP explains, potential bad actors could easily use that information to identify deficiencies in the agency's procedures and adjust their behavior to avoid detection.  *Accord Sack v. DOJ*, 823 F.3d 687, 694–95 (D.C. Cir. 2016) (upholding nondisclosure when reports identified deficiencies in polygraph procedures that "could enable criminal suspects, employees with ill intentions, and others to subvert polygraph examinations").  CBP has therefore demonstrated a risk of circumvention of law from disclosure of this information and has properly invoked Exemption 7(E).

Similar reasons justify CBP's withholding of FOIA002674–002767, which the *Vaughn* Index identifies as a "chart from [OPR] detailing 1509 summons by [Special Agent in Charge] and Date." *Vaughn* Index at 77.  The agency withheld this chart in full because it contains information "on each ongoing or closed OPR investigation, whether summons was issued, and what information was requested each time."  Howard 5th Decl. ¶ 16.  The Committee argues that disclosure of this chart will not risk circumvention of the law, but the Court disagrees.  A person who wished to avoid detection by CBP could use these details to assess and exploit CBP's habits in enforcement.  The Committee briefly responds that the agency can redact information about ongoing investigations.  *See* Pl.'s MSJ at 40–41.  But a potential criminal can glean the same information about investigative techniques from past investigations as present ones.  The agency therefore properly invoked Exemption 7(E) to withhold this chart from disclosure.

The Committee never meaningfully challenges the agency's explanation of foreseeable harm for this category.  Nor could it.  CBP identified that disclosure would give potential criminals some very specific information, including what behaviors trigger a full investigation and how CBP uses its summons authority to conduct investigations.  *See* Howard 4th Decl. ¶ 62.  That explanation shows the risk of foreseeable harm from disclosure.  And even if the agency's explanation were insufficient, the record reflects a risk of foreseeable harm.  *Reporters Comm.*, 3 F.4th at 372.  The material at issue deals with sensitive issues of law enforcement procedure and practice.  The nature of that information would be a boon to potential criminals.

The Court therefore agrees that CBP properly withheld under Exemption 7(E) the information in Category 3.

**D.**

Finally, CBP must "demonstrate that all reasonably segregable material has been released." *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002).  To meet this burden, the agency can rely on the combination of its declarations and *Vaughn* Index.  *See id.*  The agency is also "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117.  To overcome that presumption, the Committee must provide a "quantum of evidence." *Id.*

Here, CBP declares that it has released all reasonably segregable portions of the relevant records.  *See* Howard 4th Decl. ¶ 64.  The agency noted that all withheld information is either exempt or "not reasonably segregable." *Id.*  And according to the agency's declaration, "CBP analysts and attorneys reviewed each release of records line-by-line" to "determine[] whether any segregable, non-exempt information could further be released." *Id.*

The Committee briefly argues that the agency's one-paragraph explanation does not satisfy its obligation.  *See* Pl.'s MSJ at 22.  But the Committee provides no evidence, much less a "quantum," that overcomes the presumption that the agency released all reasonably segregable information.  *See Loving v. DOD*, 550 F.3d 32, 41 (D.C. Cir. 2008).  The Court accordingly finds that the agency has fulfilled its segregability obligation.

**IV.**

For these reasons, the Court will partially grant the Government's Motion for Summary Judgment and the Committee's Motion for Summary Judgment.  A separate order will issue.

Dated: October 18, 2021

_____
TREVOR N. McFADDEN, U.S.D.J.